844 So.2d 1 (2003)
Robert M. CARBO and Linda S. Carbo
v.
CITY OF SLIDELL, et al.
No. 2001 CA 0170.
Court of Appeal of Louisiana, First Circuit.
January 8, 2003.
Writ Denied April 25, 2003.
*2 Joseph E. Stockwell, III, Baton Rouge, Counsel for Plaintiffs/Appellants Robert & Linda Carbo.
*3 Dwight C. Paulsen, III, New Orleans, Counsel for Defendants/Appellees Greg S. Lyons & Sunmark Construction Co.
Neil C. Hall, III, Covington, for St. Tammany Parish.
Timothy Mathison, Slidell, for City of Slidell.
Before: FITZSIMMONS, KUHN, DOWNING, CIACCIO[1] and LANIER[2], JJ.
LANIER, J.
This is an action for an injunction. The plaintiffs, Robert M. and Linda S. Carbo (the Carbos), seek the removal of alleged obstructions of natural drainage erected by the defendants that cause flooding on the Carbos' property. In the alternative, the Carbos pray for compensatory damages if the court finds that injunctive relief is "greatly disproportionate in cost to the actual damages caused the plaintiffs, and/or the injunctive relief due the plaintiffs is found to have a substantial negative effect on third parties ...." The original defendants[3] are: (1) the City of Slidell (City); (2) the Parish of St. Tammany (Parish); (3) Gregg S. Lyons (Lyons); and (4) Sunmark Construction, Inc. (Sunmark). Lyons and Sunmark filed a motion for summary judgment asserting that they performed some of the construction work about which the Carbos complain, the work was performed with the consent of the City and the work was performed gratuitously.[4] The Parish filed a motion for summary judgment asserting it did not create the obstructions about which the Carbos complain, the constructions complained of are located entirely in the corporate limits of the City and "the Parish did not have the care, custody or control over the area in question and owed no duty to petitioners."
The trial court granted summary judgments in favor of the Parish, Lyons and Sunmark and dismissed the Carbos' injunction claims against them with prejudice. The trial court gave the following rationale for dismissing the injunction action against Lyons and Sunmark:
The court finds as a matter of law that Lyons was a mandatory [sic], and that his actions were ratified by the City of Slidell. As a matter of law, he cannot be held liable for his actions in repairing the berm. The Court further notes that injunctive relief is not applicable to Lyons or Sunmark, since they neither own now [sic] control the berm and canal. The flooding of which plaintiff [sic] complains [sic] long precedes the actions of Gregg Lyons.
The trial court gave the following rationale for dismissing the injunction action against the Parish:
It [the Parish] argues that because it neither owns the land nor the canal which are the subject of the suit, injunctive remedies under codal articles pertaining to the rights and obligations of owners of estates are not available. The court agrees with this rationale. The *4 court also agrees that the Gaharan case is inapplicable, partially because the City and Parish have the right to alter natural drainage, and certainly because the Parish does not own the land or the canal in question. The Parish has a right of way granted in 1948 for the purpose of drainage. The Court also agrees that the natural drainage can be altered by statute and by agreement, both of which have occurred. The court also finds that the canal is not a servient estate.
The Carbos took this devolutive appeal.

SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 B; Calhoun v. Hoffman-La Roche, Inc., 98-2770, p. 4 (La.App. 1 Cir. 2/18/00), 768 So.2d 57, 60-61, writ denied, XXXX-XXXX (La.6/23/00), 765 So.2d 1041. The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action, and is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966 A(2). After adequate discovery, or after a case is set for trial, a motion that shows there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law, shall be granted. La. C.C.P. art. 966 C(1). The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966 C(2).
Appellate courts review summary judgments de novo under the same criteria that govern the trial judge's consideration of whether a summary judgment is appropriate. Doucet v. National Maintenance Corp., XXXX-XXXX, p. 5 (La.App. 1 Cir. 6/21/02), 822 So.2d 60, 65.

FACTS
The evidence presented by the parties supporting and opposing the motions for summary judgment shows the following.
The Carbos allege, and the evidence shows, that they own property adjacent to the eastern corporate limits of the City. A survey map attached to the petition indicates the Carbos' property is in Lot 2 of Section 11, T9S, R14E, in St. Tammany Parish. This map also shows that the W-14 Drainage Canal enters the Carbos' property on its northern side, traverses the property in a southwesterly direction and exits the property on its west side where the property is adjacent to the City. The obstructions about which the Carbos complain are located on the west side of the W-14 canal.[5]
The Parish asserts the W-14 canal was constructed on the Carbos' property pursuant to the authority of a conventional *5 servitude granted by V.C. Scogin, an ancestor in title to the Carbos.[6] This servitude (right of way) provides as follows:
Right of Way Grant. State of Louisiana, Parish of St. Tammany, Know all men by these presents: That V.C. SCOGIN, does by these presents grant unto the Parish of St. Tammany, through its Police Jury, the necessary right of way for the construction, maintenance and improvement of drainage facilities through and across my property in: part of the West one half of the southwest one quarter of Section 11T. 9. S.R. 14. E., St. Tammany Parish, Louisiana, being understood that the Police Jury will construct and maintain a bridge across the canal at the extension of Blanchard Street, in Slidell, Louisiana; Present fence to be moved to East line of Right of Way H.O.F. WIT. V.C.S.
According to Parish Wide Drainage Program Map File No. Diversion Canal.

The consideration for this grant is the expectation of benefits to said property as a result of the drainage improvement program. (Emphasis added.)
Pursuant to interrogatories propounded by Lyons and Sunmark, the Carbos gave the following answers:
INTERROGATORY NO. 2:
Please state each and every date that any of plaintiffs' property east of the W-14 canal was damaged by flood water as alleged in Paragraphs III-G, III-J, III-K, III-O, and III-S of the petition.
ANSWER TO INTERROGATORY NO. 2:
The home [sic] was built in 1965 and the plaintiffs moved into home in November of 1965. As early as 1968 the plaintiffs experienced sporadic flooding of their property which continued through 1973. In 1973, the constructions complained of in the plaintiffs' petition were initiated, exacerbating the plaintiffs' flooding problems as more and more obstructions were completed thereafter to present.
The plaintiffs do not have records of exact dates when their residence flooded or sustained flood damage. However, the plaintiffs' land has flooded countless times over the time periods indicated and their residence has flooded at least five (5) times.
Unfortunately actual invoices, receipts and photographs evidencing the flood damages prior to 1995 were destroyed by Harold M. Wheelahan, III, a previous attorney who did not preserve their files.
INTERROGATORY NO. 3:
Please state whether plaintiffs' home has ever flooded, and, if so, please state:
a. The date or dates the home flooded;
b. The reason the home flooded;
c. Whether the flood damage was repaired, and if so, by whom and at what cost; and
d. Whether you made a claim against your homeowners' insurer or flood insurer, and, if so, the name of the insurer, the amount of the claim and the amount received.
ANSWER TO INTERROGATORY NO. 3:
a. House flooded four times between 1968 and 1973; and flooded in May of 1995; *6 b. Obstructions of natural drainage as delineated in the plaintiffs' petition;
c. Flood damage repaired by self, except for 1995 flood; and
d. Filed one claim in either 1972 or 1973 against the National Flood Insurance Program and was awarded approximately $800.00, and also filed a claim for the May 1995 flood.
INTERROGATORY NO. 4:
For each item of damages claimed in Paragraph VI-A of your petition, please give the following information:
a. The date or dates the alleged damage was sustained;
b. The amount of the damages sustained;
c. The cost of repair;
d. The cost for the construction and maintenance of the levee, pumps and plumbing referred to in Paragraph VI-A(2) of the petition; and
. . . .
ANSWER TO INTERROGATORY NO. 4:
a. House has sporadically flooded from 1968 to present;
b. For floods prior to May of 1995, the plaintiffs sustained damages including carpet, sheetrock, cabinets, appliances, paneling, and other articles customarily damaged in residences where flood waters enter a home. Receipts and invoices from previous floods were destroyed by Harold M. Wheelahan, III as indicate supra.
c. The cost of repair for the flood damage of May of 1995 was $31,560.00.
d. The total cost for the construction and maintenance of the levee, pumps and plumbing referred to in Paragraph VI-A(2) of the petition was $44,950.00.
. . . .
Pursuant to interrogatories propounded by the Carbos, Lyons gave the following answers:
ANSWER TO INTERROGATORY NO. 1
In May 1995, defendants had just begun clearing a piece of property owned by Racole Investments, LLC in order to build apartments. While clearing the property, defendants noticed that a section of the "berm" on the west side of the W-14 canal had eroded considerably, in the neighborhood of 2-3 feet. Defendants assumed that the erosion was due to the May 5, 1995 flood.
Defendants obtained the verbal consent of the City of Slidell, through its authorized agent, City Engineer Stanley P. Polivick, P.E., to repair the section of the "berm" that had eroded and on or about May 22, 1995 defendants restored the "berm" to its original condition. Sometime thereafter plaintiff Robert M. Carbo met with defendants, requested that defendants restore the "berm" to the state it was prior to May 22, 1995 and threatened to sue defendants if the "berm" was not restored to its prior condition. Defendants agreed to restore the "berm" to its prior condition and granted plaintiff Carbo permission through September 1, 1995 to cross property owned by Racole Investments, LLC and/or Berkley Apartments, A Partnership in Commendam, to lower the height of the "berm" to protect plaintiffs' property in case of emergency. Defendants notified the City of Slidell through City Engineer Polivick of the foregoing and requested permission to restore the "berm" to its prior condition. *7 In correspondence dated August 15, 1999, the City of Slidell issued a "directive" to defendants to "... leave the levee in the repaired state." See August 15, 1995 letter of City Engineer Polivick.
. . . .
ANSWER TO INTERROGATORY NO. 5
Defendants restored the "berm" on the west side of the W-14 canal to its original state on or about May 22, 1995 to protect the persons and property of hundreds of residents of the City of Slidell from further flooding and because it was the "right thing to do." Defendants had a bulldozer at the site in order to clear property owned by Racole Investments, LLC to construct apartments and it took defendants less than one hour to restore the "berm" to its original condition.

ANSWER TO INTERROGATORY NO. 6

See defendants' answer to interrogatory no. 2. The properties owned by Berkley Apartments, A Partnership in Commendam and Racole Investments, LLC include portions of the W-14 canal, as evidenced by the surveys defendants produced in response to request for production no. 1 of Plaintiffs' First Requests for Production.
. . . .
ANSWER TO INTERROGATORY NO. 8

The section of the "berm" that apparently eroded in the May 5, 1995 flood and that defendants restored to its original condition on or about May 22, 1995 is located on property owned by Racole Investments, LLC. (Emphasis added.)
In his deposition, Lyons testified that the Carbo property is adjacent to the property where the berm was repaired. Lyons denied that he dammed a creek.
In answer to interrogatories propounded by Lyons and Sunmark, the City admitted that it authorized and ratified the berm repair gratuitously done by Lyons and Sunmark on or about May 22, 1995, and denied that "Gregg S. Lyons was acting as a duly authorized agent for the City of Slidell when he made repairs to the `berm' or levee on the west side of the W-14 canal in May 1995."
In an affidavit, Daniel G. Zechenelly, Sr. identified himself as "an employee of the St. Tammany Parish Police Jury, Department of Public Works, since February 18, 1981" who at the time of the affidavit (September 15, 1999), was "the Foreman of Area III which includes the area where the Carbo property is located." Zechenelly stated the following:
I have personal knowledge of the dam which is described in the Carbos' lawsuit as being located at the mouth of the creek where it intersected the W-14 Canal.
I also have personal knowledge of the levee or berm that is referred to in the lawsuit as being along the west bank of the W-14 canal between Cousin and Danny Streets.
I am familiar with the allegations that, due to the levee or berm, water is now trapped on the plaintiffs' property to an even greater extent during heavy rains, because water cannot overflow the W-14 Canal bank to the west, as it did during extreme rains prior to the City of Slidell's construction of the levee or berm and due to the City of Slidell's and/or St. Tammany Parish's damming of the creek, water cannot continue past the plaintiffs' property in its natural course through the creek to the lower land in the west and southwest. Instead, rain water simply fills the W-14 Canal to capacity and then backs up on the plaintiffs' property, causing severe flooding *8 and damages. To my knowledge, the west bank of the W-14 Canal and the dam and levee on the west side of the W-14 Canal, at the location in question, are all within the corporate limits of the City of Slidell.
I know that during my term of employment neither myself nor anyone else assigned to perform maintenance in the area in question has done anything to create or exacerbate drainage problems for the Carbo property. The Parish of St. Tammany did not create the earthen dam at the mouth of the creek where it intersects the W-14 Canal and did not create or rebuild the levee or berm that is referred to in the lawsuit as being along the west bank of the W-14 canal between Cousin and Danny Streets.

To the best of my knowledge, the W-14 Canal was created several decades ago by the Louisiana Department of Transportation and Development's Office of Public Works. (Emphasis added.)
In an affidavit, James R. Clary, Sr. identified himself as having "been retained by Robert and Linda Carbo ... as an expert witness to testify at trial regarding obstructions to natural drainage ...." He stated, in pertinent part, the following:
2.
I attended an initial meeting on April 19, 1996, in Slidell at City Hall with Messrs. Stan Polivick, Dan Yeates, and Lloyd Walters, in order to discuss the plaintiffs' petition and the obstructions to natural drainage the plaintiffs complained of.
3.
At the meeting, both Messrs. Polivick and Yeates admitted that the City had maintained the levee and dam at issue in this suit so as to repel waters from Slidell and that the dam and levee were directly across the W-14 Canal from the plaintiffs' property.
4.
Both Messrs. Polivick and Yeates agreed that the removal of the dam and levee system located across the W-14 Canal from the plaintiffs' property would cause severe flooding in the City of Slidell, and Mr. Yates [sic] indicated that it would "put six feet of water in downtown Slidell."
5.
Messrs. Polivick and Yeates could not, at that meeting, define what St. Tammany Parish's role had been in the maintenance of the W-14 Canal, or the construction of the obstructions. (Emphasis added.)

DENIAL OF CONTINUANCE

(Assignments of Error Nos. 1 and 7)
In these assignments of error, the Carbos assert the trial court erred in not granting their motion for a peremptory and/or discretionary continuance of the summary judgment hearings to allow them (1) further discovery to show "that St. Tammany Parish is the owner [of] a right of way at the site where obstructions to natural drainage are located", and (2) "to seek entry on to Gregg S. Lyons property and conduct a survey to determine the boundary lines of ownership in order to establish whether the defendant trespassed on plaintiffs' property."
This suit was filed on March 25, 1997. Lyons and Sunmark filed their motion for summary judgment on August 27, 1999, and the Parish filed its motion on September 17, 1999. Both motions were set for a hearing on November 17, 1999. These motions ultimately were heard on December *9 16, 1999, and they were denied. At this same time, the trial court (1) ordered the depositions of Lyons and Sunmark taken not later than February 14, 2000; (2) granted Lyons, Sunmark and the Parish the right to reset their motions for summary judgment; and (3) fixed the trial on the merits for September 21 and 22, 2000. Lyons and Sunmark filed a motion to reset a hearing on their summary judgment on March 3, 2000, and the Parish filed a similar motion on March 27, 2000. Both were fixed for hearings on May 10, 2000.
On May 2, 2000, the Carbos filed a motion to continue the hearings fixed for May 10, 2000. They asserted entitlement to the continuance because of newly discovered evidence (the Scogin-Parish right of way agreement) provided to them by the Parish on April 19, 2000, and the refusal of Lyons to allow them "access to his property for the purpose of surveying and identifying the exact location of the dam at issue, etc." A written notation on the order attached to this motion states "Ct Denied mtn to Continue in Open Court 5/10/00".
Continuances in civil proceedings are provided for in La. C.C.P. art. 1601 et seq. In Heaton v. Gulf International Marine, Inc., 536 So.2d 622, 625 (La.App. 1 Cir. 1988), appears the following:
On appeal, defendants contend that they were entitled to a continuance under the provisions of La. C.C.P. art. 1601 and 1602. La. C.C.P. art. 1602 provides "[a] continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance." When the conditions of art. 1602 are met, the granting of a continuance is mandatory. Armstrong v. State Farm Fire & Cas. Co., 423 So.2d 79 (La.App. 1st Cir. 1982). An additional ground for granting a continuance is addressed in La. C.C.P. Art. 1601 which provides "[a] continuance may be granted in any case if there is good ground therefor." Under this article, a continuance rests within the sound discretion of the trial court. Sparacello v. Andrews, 501 So.2d 269 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La.1987).
The survey map attached to the Carbos' petition and the evidence show that the western boundary of the Carbos' property also is the eastern corporate limit of the City. If this survey line has been obliterated, it can easily be re-established by a new line using the original boundary corner and line monuments and the same courses and distances. Such a new survey can be made from sites on the Carbos' property. Such a survey could have been made at any time after suit was filed on March 25, 1997, and well prior to the May 10, 2000 summary judgment hearings. Such a survey would have revealed if the dam and/or the berm (levee) complained of were on the Carbos' property or on other property. If the dam and/or berm were not on the Carbos' property, then they were on the property of someone else and are located in the City. This evidence could have been obtained by the Carbos through the exercise of due diligence. The Carbos' claim that their inability to go on the "Lyons" property to conduct a survey affecting their ability to locate their boundary is without merit.
Ownership of the properties adjacent to and west of the Carbos' property and the authority pursuant to which the W-14 canal was constructed was available to the Carbos at any time before or after their *10 suit was filed. First, the Carbos could have run their own chain of title in the public conveyance records of St. Tammany Parish. This would have revealed the Scogin-Parish servitude for the canal.[7] These same public records would reveal the ownership of the properties adjacent to and west of the Carbos' property. It is reasonable to infer that since the servitude contract for the Scogin-Carbo property was recorded in the public records, the contracts for other canal servitudes were similarly recorded. A simple search of the public records would have revealed whether or not this inference is correct. This title search could have been made before or after suit was filed in 1997 and before the Carbos received the copy of the Scogin-Parish servitude contract from the Parish on April 19, 2000. Between April 19, 2000, and May 10, 2000, the requisite title search could have been conducted and the appropriate documents could have been obtained with the exercise of due diligence.
The evidence, for which the Carbos contend they should have been granted a peremptory continuance, could have been obtained through the exercise of due diligence. Discovery need not be completed and a party may not rely on his own delinquency in conducting discovery to prevent a summary judgment. Weathersby v. Jacquet, XXXX-XXXX, pp. 4-5 (La.App. 3 Cir. 4/3/02), 813 So.2d 1135, 1138-1139. Finally, review of the record shows that the trial court did not abuse its discretion by refusing to grant a discretionary continuance.
These assignments of error are without merit.

RIGHT TO INJUNCTION

(Assignments of Error Nos. 2, 3, 4, 5 and 6)

Applicable Law on Injunctions
Injunction is a special proceeding and a provisional remedy provided for in La. C.C.P. art. 3601 et seq. Louisiana Code of Civil Procedure article 3601 provides, in pertinent part, as follows:
An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law.... (Emphasis added.)
Injunctive relief is specifically provided for by La. C.C.P. art. 3663 for the possessor of a real right in immovable property. Article 3663 provides, in pertinent part, as follows:
Injunctive relief, under the applicable provisions of Chapter 2 of Title I of Book VII, to protect or restore possession of immovable property or of a real right therein, is available to:
(1) A plaintiff in a possessory action, during the pendency thereof; and
(2) A person who is disturbed in the possession which he and his ancestors in title have had for more than a year of immovable property or of a real right therein of which he claims the ownership, the possession, or the enjoyment. (Emphasis added.)
Revision Comment (b) for Article 3663 provides as follows:
(b) Injunctive relief is made available in two separate and distinct types of cases: (1) as an ancillary remedy in a possessory action; and (2) as the relief to be granted in an injunction suit brought to enjoin trespassers and other disturbers, *11 and which is neither a possessory nor a petitory action. See Churchill Farms v. Gaudet, 184 La. 984, 168 So. 123 (1936). (Emphasis added.)
As indicated by the authorities cited herein below, a personal servitude of right of use on an immovable (such as the Carbos' property) is an incorporeal immovable and a real right. Irreparable injury is not an element of proof for obtaining injunctive relief pursuant to Article 3663. A. Yiannopoulos, 2 La. Civ. Law Treatise, Property, § 299, pp. 590-595 (4th Ed.2001) and the cases cited therein.[8]

Applicable Law on Servitudes
Louisiana Constitution of 1974, art. I, § 4, provides, in pertinent part, as follows:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.

Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. (Emphasis added.)
A person[9] may have (own) a right of servitude in a thing. La. C.C. art. 476. Private things (such as the Carbos' property) may be subject to public use in accordance with law or by dedication. La. C.C. art. 455. Servitudes on immovable things are incorporeal immovables. La. C.C. arts. 461 and 470.
The police power is the plenary power of the State of Louisiana to do what is necessary to protect the people's health, safety, welfare and morals. See the excellent discussion of the police power in Morial v. Smith & Wesson Corporation, XXXX-XXXX, pp. 17-18 (La.4/3/01), 785 So.2d 1, 15.
There are two kinds of servitudes: (1) personal and (2) predial. La. C.C. art. 533. A personal servitude is a charge on a thing for the benefit of a person (the Parish). La. C.C. art. 534. A predial servitude is a charge on a servient estate for the benefit of a dominant estate. La. C.C. art. 646. The personal servitude of right of use confers in favor of a person a specified use of an estate less than full enjoyment (such as drain). La. C.C. art. 639. A right of use servitude is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude. La. C.C. art. 645. Thus, a conventional right of use servitude may be established by a juridical act. La. C.C. art. 654.
The parties to the Scogin-Parish contract established a servitude by a juridical act. This contract must be interpreted pursuant to the general rules for interpreting contracts, found in La. C.C. art.2045 et seq., and the special rules for interpreting servitude contracts found in La. C.C. arts. 697-734. Ogden v. Bankston, 398 So.2d 1037 (La.1981).
The Scogin-Parish contract is clear and unambiguous in stating that "V. C. Scogin, does by these presents grant unto the *12 Parish of St. Tammany, through its Police Jury [a person], the necessary right of way for the construction, maintenance and improvement of drainage facilities ...." This language grants a servitude in favor of a person; it does not grant a servitude in favor of an estate. A right to drain can be granted in a conventional, personal right of use servitude. La. C.C. arts. 640, 699 and 706; Hunter Co. v. Ulrich, 200 La. 536, 551, 8 So.2d 531, 536 (1942); King v. Strohe, 95-656, pp. 1-5 (La.App. 3 Cir. 5/8/96), 673 So.2d 1329, 1331-1338.[10] The contract herein gives the Parish the right to use the property "for the construction, maintenance and improvement of drainage facilities ...." This servitude is located and its extent fixed "[a]ccording to Parish Wide Drainage Program Map File No. Diversion Canal" referenced in the act creating the servitude. The Carbos' property is analogous to a servient estate for purposes of this servitude in favor of the Parish.
The right of use includes the rights contemplated or necessary to enjoyment at the time of the creation of the servitude, as well as rights that may later become necessary, provided that a greater burden is not imposed on the property. La. C.C. art. 642. Pursuant to La. C.C. art. 645, the following additional rules are applicable. The Parish has the right to enter with its workmen and equipment into the part of the Carbos' property that is needed for the construction or repair of works required for the use and preservation of the servitude. La. C.C. art. 745. See also La. R.S. 38:113 and Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314, 317 (La.1981). The Parish may deposit materials to be used for the works and the debris that may result, under the obligation of causing the least possible damage and of removing them as soon as possible. The Parish has the right to make at its expense all works that are necessary for the use and preservation of the servitude. La. C.C. arts. 744 and 745; Tournillon v. Sewerage and Water Bd. of New Orleans, 96-1457 (La.App. 4 Cir. 2/12/97), 689 So.2d 655, writ denied, 97-0662 (La.4/25/97), 692 So.2d 1091; Dautreuil v. Degeyter, 436 So.2d 614, 617 (La.App. 3 Cir.1983). However, rights that are necessary for the use of the servitude are acquired at the time the servitude is established. They are to be exercised in a way least inconvenient for the property burdened by the servitude. La. C.C. art. 743; Jackson v. Jackson, 2000-2591, p. 10 (La.App. 1 Cir. 3/6/02), 818 So.2d 192, 199. See generally A. Yiannopoulos, 3 La. Civ. Law Treatise, Personal Servitudes, §§ 222-230, pp. 454-475 (4th Ed.2000).
The natural servitude of drainage is provided for in La. C.C. art. 655 as follows:
An estate situated below is bound to receive the surface waters that flow naturally from an estate situated above unless an act of man has created the flow. (Emphasis added.)
The prescription of nonuse does not run against natural servitudes. La. C.C. arts. 758 and 3448; Gaharan v. State, Dep't of Transp. and Dev., 579 So.2d 420, 422 (La. 1991) However, the natural servitude of drainage may be altered by agreement (juridical act) if the public interest is not affected adversely. La. C.C. art. 729; Eubanks v. Bayou D'Arbonne Lake Watershed District, 32,334, p. 9 (La.App. 2 Cir. 9/22/99), 742 So.2d 113, 119, writ denied, *13 99-3026 (La.12/17/99), 751 So.2d 887. The natural servitude of drainage can be altered by lawful acts of persons. Elam v. Cortinas, 219 La. 406, 53 So.2d 146 (1951); St. Martin v. General Homes-Louisiana, Inc., 467 So.2d 1361 (La.App. 5 Cir.1985). Finally, the natural servitude of drainage can be altered by "the reasonable exercise of the police power." La. Const. of 1974, art. I, § 4.
All of the State of Louisiana (State) was naturally drained prior to human habitation. This natural drainage was dependent upon the quirks of nature and resulted in extensive flooding. With the advent of human occupancy, alteration of natural drainage patterns began. Without alteration of the State's natural drainage patterns, vast areas of land in the State would be unsuitable for residential, agricultural, recreational or commercial purposes.
The State has utilized its police power to effect extensive alterations to its natural drainage. The governor has been given extensive authority to act in matters pertaining to flood control and drainage. La. R.S. 38:81 et seq. A State Department of Public Works has been created to oversee levees, canals and drainage systems. La. R.S. 38:1 et seq. A statewide flood control program has been adopted by the legislature. La. R.S. 38:90.1 et seq. State soil conservation districts have been created with authority over floodwater and land drainage. La. R.S. 3:1201 et seq. Numerous state and local government levee and/or drainage districts have been created and/or authorized. La. R.S. 38:111 et seq.; 38:281 et seq.; 38:1481 et seq.; 38:1601 et seq.; 38:1751 et seq. The unauthorized interference with, or obstruction of, natural or artificial drainage has been made criminal. La. R.S. 38:214, 215, 218 and 219. In 1950, pursuant to La. R.S. 33:1236(13), a police jury had the following power pertaining to drainage:
To construct and maintain drainage, drainage ditches, and drainage canals; to open any and all drains which they may deem necessary and to do and perform all work in connection therewith; to cut and open new drains, ditches and canals, to acquire lands for necessary public purposes, including rights of way, canals and ditches by expropriation, purchase, prescription or by donation; to enter into contracts for the construction of such drainage works, and to purchase machinery and have the work performed under their own supervision; to allocate, use and expend the general alimony of the parish for any of the above purposes; to incur debt and issue bonds for drainage and drainage canals in the manner provided for by Subtitle II of Title 39; and use such other funds as may be legally expended for such purposes; to levy taxes for the maintenance of said drainage works in the manner provided for and under the authority of Article X, Section 10 of the Constitution of the State of Louisiana, as amended, and to construct any works and do any and all things necessary to effect proper drainage and carry this Paragraph into effect; to enter into contracts or agreements, under such terms and conditions as may be mutually agreeable with the State of Louisiana, through the Department of Public Works for the securing of State aid for the purposes herein authorized; to cooperate and participate in any State or Federal program which may now exist or which may hereafter come into effect under any State or Federal law. Police juries shall open all natural drains which they deem necessary in their respective parishes and shall perform all work connected therewith, which they may deem necessary to make the opening of natural drains effective. They may perform all other acts necessary to fully drain *14 all the land in their respective parishes and maintain such drainage when established. This Paragraph is intended to furnish additional means whereby parishes in the State of Louisiana may accomplish the objects and purposes herein referred to, and shall be liberally interpreted. (Emphasis added.)

Injunctive Relief Sought by the Carbos
In their petition, as amended, the Carbos seek the following injunctive relief:
(1) "Total removal of the dam where the creek meets the W-14 Canal";
(2) "Total removal of all material from the western bank of the W-14 Canal so as to restore the bank of the W-14 canal to a grade that is level with or below the natural topography of other properties adjacent to the W-14 Canal's western bank ....";
(3) "The removal of all structures built on top of the original creek bed, west of the W-14 Canal, and the total restoration of the creek to its original course, depth, and breadth...."; and
(4) "The removal of all fill dirt and/or obstructions directly adjacent to the mouth of the creek ...."

Injunction Against the Parish

(Assignments of Error Nos. 2, 3 and 4)
The Carbos assert the trial court erred by denying them an injunction against the Parish because (1) it found that "no genuine issue of material fact exists to prove that ... [the Parish] owns the `W-14', on or near where obstructions to natural drainage have been constructed"; (2) it ruled "as a matter of law the `W-14' and/or the right of way upon which the canal is located is not considered a servient estate for the purposes of natural drainage"; and (3) it ruled "as a matter of law that a right of way granted to the ... Parish, by plaintiffs' ancestor-in-title constitutes an agreement thereby providing [the] ... Parish with contractual authority to obstruct natural drainage."
The Scogin-Parish servitude contract gives the Parish the right to use the Carbo property to construct, maintain and improve the W-14 Canal for the purpose of draining water across it. If the Parish owned the estate adjacent to the Carbos' estate and this was a predial servitude, the Parish's estate would be the dominant estate and the Carbos' estate would be the servient estate. Because the Scogin-Parish servitude is a personal servitude of right of use for drainage, there is no dominant estate. Without a dominant estate, there can be no servient estate. However, the legal obligations owed by the Carbos and their property to the Parish are analogous to that of a servient estate.
Pursuant to La. C.C. art. 655, there is no natural servitude of drainage from one estate to another when "an act of man has created the flow." The construction and operation of the W-14 Canal has altered the natural drainage on the Carbos' property and on all other properties through which it traverses. That is what it is specifically designed to do. The Scogin-Parish servitude agreement states that the servitude is being given in consideration of an expected "drainage improvement program". This obviously contemplated an artificial change in the existing natural drainage. Waters drain into the W-14 Canal north of the Carbos' property and, after being collected therein, flow in a southwesterly direction across the Carbos' property. The water exits the Carbos' property on its western boundary and flows into the City. The W-14 Canal is an artificial drainage channel whose water flow has been created by "an act of man".[11] *15 Therefore, Article 655 pertaining to the natural servitude of drainage is not applicable and the W-14 Canal is not a servient estate.
In paragraph III-T of their petition, the Carbos allege they "actually own the property where the creek meets the W-14 Canal and where the dam was constructed by the defendants" and refer to a survey map attached as Exhibit C. Exhibit C has an arrow drawn on it entitled "LOCATION OF DAM", but the point of the arrow ends to the west of, and does not touch, the City-Carbo boundary line. In their appellate brief, the Carbos stated: (1) "[t]he source of the flooding problem primarily involves two construction projects that have been built adjacent to the Carbos' property on or near a man made canal known as the `W-14' that prevent the natural drainage of surface waters."; (2) "in addition to the construction of the dam, a levee or type of berm was built over portions of the western side of the `W-14' across from the Carbos property."; and (3) "surface waters that would normally drain into and over the `W-14' during rain storms became trapped by the dam and berm structures forcing flood waters to back up on to the Carbos property." (Emphasis added.) Finally, in Paragraph II-A of their petition, the Carbos admit they own "40 acres of property adjacent to and outside the eastern border of the City of Slidell ...." (Emphasis added.)
In answer to a written interrogatory, Lyons declared that "[t]he section of the `berm' ... that defendants restored ... is located on property owned by Racole Investments, LLC." In his deposition, he states that the Racole property is adjacent to the Carbos' property. In an affidavit, Daniel G. Zechenelly, Jr., the Parish's Foreman for public works in the area where the Carbos' property is located, stated that "[t]he west bank of the W-14 Canal and the dam and levee on the west side of the W-14 Canal, at the location in question, are all within the corporate limits of the City of Slidell." Because the berm and dam are in the City's limits, they are not on the Carbos' property.
Although the Carbos allege in their petition that the dam was constructed on their property, the summary judgment evidence and the Carbos' admissions in their brief show that the dam and berm are not located on their property but are located on the property of other persons in the City. The summary judgment evidence given by Lyons shows that the part of the berm that was repaired is located on Racole's property. The record does not reflect who owns the property where the dam is located.
In his reasons for judgment, the trial judge stated that "[t]he Parish does not own the land or the canal in question." This statement is not factually or legally accurate. The Carbos' predecessor in title conveyed to the Parish a personal servitude of right of use for the construction, maintenance and improvement of the W-14 drainage canal.[12] The cause (consideration) for this contract was (1) construction of a bridge across the canal, (2) relocation of a fence, and (3) benefits from drainage improvement (changing natural drainage). This servitude dismembered the total ownership rights of the owner of the property and it is an incorporeal immovable right subject to ownership. La. *16 C.C. arts. 461 and 470. Simply stated, the Parish owns a servitude on the Carbos' property to use it for the operation of the W-14 Canal. In this sense, the Parish owns the canal on the Carbos' property and owns the canal on any other property on which it has a similar servitude.
However, although (1) the W-14 Canal is not a servient estate, (2) the natural servitude of drainage does not apply, (3) the Carbos do not own the land where the obstructions are situated, and (4) the trial judge committed legal error in defining the Parish's servitude rights, the issue of whether the Parish is entitled to a summary judgment still remains.
The factual essence of the Carbos' claim is that (1) the Parish has a real right (servitude or otherwise) in the property where the dam and/or the berm on the W-14 canal is located; (2) these constructions were built after the Scogin-Parish servitude was established; and (3) these constructions have made the servitude more onerous than when it was established in violation of La. C.C. arts. 642 and 743. La. C.C.P. arts. 862 and 1154. The Carbos' rights[13] provided for in Articles 642 and 743 are real rights that can be enforced by the injunction remedy provided for in La. C.C.P. art. 3663(2).
The initial burden of proof is on the Parish as the movant on a motion for summary judgment. However, as a party defendant, the Parish will not have the burden of proof on the trial of the merits. Therefore, the Parish need not negate all essential elements of the Carbos' claim against it; the Parish can prevail on its motion if it can show an absence of material fact to support any essential element of the Carbos' claim against it.
In their amended petition, the Carbos assert, in pertinent part, that: (1) "St. Tammany Parish undertook the digging of what is known as the `W-14 Canal"'; (2) "[b]eginning in approximately 1972 ... the Parish ... began altering natural drainage by damming the mouth of the creek [Bayou Potassat] where it intersected the W-14 Canal ...."; (3) "[t]he plaintiffs, being situated on the east side of the W-14 Canal, began to experience flooding on their property, because the water that naturally drained to the west through the creek was blocked by the dam, directly causing water to back up on the plaintiff's property"; (4) "rain water simply fills the W-14 Canal to capacity and then backs up on the plaintiffs' property, causing severe flooding ...."; and (5) "the defendants created yet another obstruction by building the levee on the west side of the W-14 Canal ...."
In their answers to interrogatories, the Carbos stated the following:
As early as 1968 the plaintiffs experienced sporadic flooding of their property which continued through 1973. In 1973, the constructions complained of in the plaintiffs' petition were initiated, exacerbating the plaintiffs' flooding problems as more and more obstructions were completed thereafter to present.
In his affidavit, Zechenelly stated "I know that during my term of employment neither myself nor anyone else assigned to perform maintenance in the area in question has done anything to create or exacerbate drainage problems for the Carbo property." Zechenelly worked for the Parish at least from February 18, 1981, until his affidavit was given in 1999. Whether or not the servitude was made more burdensome on the Carbos' property after the servitude was established, is a *17 material issue of fact. La. C.C. arts. 642 and 743. The Zechenelly affidavit does not refute the Carbos' interrogatory answers for the period of 1968 to 1981. For the period of 1981 until 1999, there is a dispute about these material facts between the Carbos and Zechenelly. The Parish is not entitled to a summary judgment on this basis.
In answers to interrogatories, the City stated that the date of the development of the property "in the vicinity of Bayou Pattasat... is not firmly established", but that "[a] reasonable guess would be the early sixties" and "[t]he development was done several years after the construction of the W-14 canal." The rights necessary for the use of a servitude are acquired at the time the servitude is established. La. C.C. art. 743. The Scogin-Parish servitude was established on September 9, 1949. The record on appeal does not reflect when the W-14 Canal was built. The extent of the servitude was fixed by reference to a "Parish Wide Drainage Program Map File No. Diversion Canal" incorporated in the contract by reference. This map is not in the record. There is nothing in the record that shows the extent of the servitude or the structure of the W-14 Canal at the time it was built.
Because the Parish obtained a servitude from Mr. Scogin for the construction of the W-14 Canal, it can reasonably be inferred that the Parish obtained other servitudes for the canal from other property owners in the area. See, for example, Brown v. Rougon, 552 So.2d 1052, 1054 (La.App. 1 Cir.1989), writ denied, 559 So.2d 121 (La. 1990). If the Parish obtained W-14 servitudes on the property or properties where the dam and the berm are located, it (the Parish) would have responsibility for what was constructed on its servitude and could remove constructions placed thereon illegally or without its consent. If the Parish had such servitudes and entered into intergovernmental contracts for the construction of the dam and/or berm on its servitude after the initial construction of the W-14 Canal, then it would be directly responsible for them.[14] Conversely, if the Parish does not own servitudes where the berm and dam are located, and the dam and berm were built without the participation of the Parish, then the Parish would be entitled to summary judgment dismissing the Carbos' claims against it.
Unfortunately, there is insufficient evidence in the record to adjudicate this issue. In addition to the lack of evidence previously noted, the record does not reflect whether or not the Parish obtained servitudes from the owners of the properties where the berm and dam are located. As previously indicated, the initial burden of proof in a motion for summary judgment is on the movant, who, in this case, is the Parish. The inadequacy of the record is imputed to the Parish and the burden of proof has not shifted to the Carbos. The burden was on the Parish to negate the assertions in the Carbos' pleadings with summary judgment evidence. Motton v. Lockheed Martin Corporation, 97-0204, p. 7 (La.App. 4 Cir. 12/1/97), 703 So.2d 202, 205. The Parish has failed to do so and is not entitled to a summary judgment.
The trial court erred in granting summary judgment in favor of the Parish.
These assignments of error have merit.

Injunction Against Lyons and Sunmark

(Assignments of Error 5 and 6)
The Carbos assert the trial court erred by denying them an injunction *18 against Lyons and Sunmark because (1) no "valid contract of mandate existed between defendants, Gregg S. Lyons and the City of Slidell, thereby releasing Gregg S. Lyons and his company, Sunmark Construction, Inc., from liability for restoring an obstruction to natural drainage when both defendants lacked authority as owners of servient estates to prevent the natural flow of surface waters", and (2) "in finding that no genuine issue of material fact remains as to whether defendants, Gregg S. Lyons and the City of Slidell, actually agreed to a contract of mandate when the record is void of any written evidence of such an agreement and the City of Slidell denies that Gregg S. Lyons acted as its authorized agent."
In his deposition and answers to interrogatories, Lyons gave the following pertinent testimony. On or about May 22, 1995, Sunmark contracted with Bruce Woods to do bulldozer work on land owned by Racole Investments, LLC (Racole) in the City. Sunmark and Racole were corporations in which Lyons and his wife were the sole stockholders. While the bulldozer work was being done, Lyons noticed that a portion of the berm on the west side of the W-14 Canal located on the Racole property was "eroded". Lyons assumed this erosion was caused by the May 5, 1995 flood. Lyons, with the consent of the City, gratuitously "restored" the berm "to its original condition" using Woods' bulldozer. Lyons knew nothing about a dam and did no other work pertaining to the W-14 Canal. The Carbos presented no summary judgment facts that conflict with these facts.
Initially, it must be noted that no summary judgment evidence was presented by the Carbos that connects Lyons or Sunmark with the dam and creek obstructions about which the Carbos complain in injunction requests (1), (3) and (4) listed herein above. Therefore, there is no genuine issue of material fact concerning Lyons' testimony that he had no knowledge of, or connection with, these obstructions. Accordingly, Lyons and Sunmark are entitled to summary judgments on those issues.
As to the repair of the W-14 Canal berm (item 2), the trial court held, in part, that Lyons and Sunmark could not be enjoined to remove "all material from the western bank of the W-14 Canal" berm because they were mandataries for the City "as a matter of law". In a written interrogatory, the City denied "that Gregg S. Lyons was acting as a duly authorized agent for the City of Slidell when he made repairs to the `berm' or levee on the west side of the W-14 Canal in May 1995." This is a genuine issue of material fact of the type that ordinarily would preclude a summary judgment. The trial court judge erred by ruling otherwise.
However, Lyons and Sunmark are entitled to summary judgment whether they were or were not mandataries. The trial court held, and the uncontested facts show, that neither Lyons nor Sunmark owned or controlled the berm or the property and/or servitude on which it was constructed. The property is owned by Racole. Thus, Lyons and Sunmark as non-owners have no legal authority to enter the property and/or remove the berm (assuming that the Carbos are entitled to such relief). They merely gratuitously repaired the berm with the consent of the City (when the City acted with apparent authority). Racole is not a party to this suit and will not be affected by a judgment rendered herein.
Finally, the Carbos assert that "... as the sole owner of these companies, Mr. Lyons controls, manages, and is completely responsible for the said property", Lyons is "the alter ego of the above mentioned companies and every act undertaken *19 was by Mr. Lyons and his solely owned companies" and the corporations "were simply established for tax purposes." Lyons, Sunmark and Racole are three separate persons. La. C.C. art. 24. The shareholders of a corporation (Lyons and his wife) are not liable personally for the acts of the corporations. La. R.S. 12:93. In Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164, 1168 (La.1991), the court stated that when considering "piercing the corporate veil" the following factors should be considered, along with the totality of the circumstances: (1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) under capitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings. The Carbos have produced no summary judgment evidence pertaining to any of these five factors. Accordingly, this argument must fail.
These assignments of error are without merit.

DECREE
For the foregoing reasons, the summary judgment granted in favor of Lyons and Sunmark against the Carbos is affirmed; the summary judgment granted in favor of the Parish against the Carbos is reversed and this portion of the Carbos' claim is remanded to the trial court for further proceedings in accordance with law. The Carbos and the Parish are each cast for 50% of the total cost of this appeal of $1,728.25.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
FITZSIMMONS, J., concurs in the result, and assigns reasons.
FITZSIMMONS, J., concurs in the result, and assigns reasons.
FITZSIMMONS, Judge, concurring, with reasons.
I respectfully concur in the result. Admittedly, the parish owns the servitude over which the canal is located. However, the Carbos have not asked that the canal be removed, nor do they claim that the canal worsened their drainage in violation of the servitude agreement. The obstructions complained of are the dam and the berm. Genuine issues of material fact do remain on whether the parish acquired servitudes or rights of way over the property where the berm and dam were built, and whether the parish performed any maintenance. As to Lyons and Sunmark, no genuine issues of material fact exist concerning the only issues raised by the Carbos on appeal.
NOTES
[1] The Hon. Philip C. Ciaccio, Judge (retired), Fourth Circuit Court of Appeal, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The Hon. Walter I. Lanier, Jr., Judge (retired), First Circuit Court of Appeal, is serving as judge ad hoc by special appointment of the Louisiana Supreme Court.
[3] Additional persons not pertinent to this appeal were subsequently added as parties defendant.
[4] Lyons and Sunmark also filed a cross-claim against the City for indemnification and/or contribution. The trial court granted a summary judgment in favor of them and against the City on the cross-claim. The City did not appeal this judgment.
[5] These obstructions are referred to in the record as a berm, levee and/or a dam. It appears that the dam is a separate structure from the berm.
[6] The descriptions of the Carbos' property on the survey map and in the servitude agreement are not identical. The record does not show how the Carbos acquired ownership nor does it contain a chain of title from Scogin to the Carbos. However, in brief, the Carbos concede that the Scogin servitude affects their property. La. C.C. art. 1853.
[7] This document shows it was recorded in the public records on March 25, 1952, in Conveyance Book 205, folio 347.
[8] There is jurisprudence that indicates that injunction is not available where a public work is completed or substantially completed. Verdun v. Scallon Bros. Contractors, Inc., 263 La. 1073, 270 So.2d 512 (1972); Gray v. State, Dep't of Highways, 250 La. 1045, 202 So.2d 24 (1967). Cf. Airline Constr. Co., Inc. v. Ascension Parish School Bd., 568 So.2d 1029 (La.1990); Bristol Steel and Iron Works, Inc. v. State, Dep't of Transp. and Dev., 507 So.2d 1233 (La.1987).
[9] A person as used in this opinion can refer to a natural or juridical person. La. C.C. arts. 24, 479 and 641.
[10] See also Sharp v. Harrell, XXXX-XXXX (La. App. 1 Cir. 5/12/00), 762 So.2d 1119, writ denied, 2000-2458 (La.11/3/00), 773 So.2d 150 (power line); Wood v. Bonomolo, 2000-61 (La.App. 5 Cir. 5/30/00), 762 So.2d 261, writs denied, 2000-2345, 2000-2276 (La.12/8/00), 776 So.2d 459 (alley).
[11] The map attached to the Carbos' petition as Exhibit C shows the Carbos have a twelve foot wide drainage ditch that flows into the W-14 Canal. The record does not reflect to what extent, if any, this drainage channel alters the natural drainage on the Carbos' property.
[12] See A. Yiannopoulos, 2 La. Civ. Law Treatise, Property, § 79, pp. 160-164 (4th Ed.2001).
[13] The prescriptive period for these rights is not at issue in this case. Because these rights do not pertain to a natural servitude, La. C.C. art. 758 does not apply.
[14] In his affidavit, Zechenelly stated "the W-14 Canal was created several decades ago by the Louisiana Department of Transportation and Development's Office of Public Works." La. Const. of 1974, art. VI, § 20; La. R.S. 33:1324 and various statutes in Title 38 of the Revised Statutes.