# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #004

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **29th day of January, 2020** are as follows:

**BY Kirby, J.:**

2019-C-00160      STEVE CROOKS AND ERA LEA CROOKS VS. STATE OF LOUISIANA, DEPARTMENT OF NATURAL RESOURCES (Parish of Rapides)

We granted certiorari in this class action to determine whether the plaintiffs' inverse condemnation claims for compensation against the State of Louisiana have prescribed under La. R.S. 13:5111 and/or 28 U.S.C. § 2501. The lower courts relied on the decision in Cooper v. Louisiana Department of Public Works, 03-1074 (La. App. 3 Cir. 3/3/04), 870 So. 2d 3151, to conclude the one-year prescriptive period for damage to immovable property found in La. C.C. art. 3493 governed and the continuing tort doctrine applied to prevent the running of prescription on the plaintiffs' claims. For the reasons that follow, we find the lower courts erred in relying on Cooper and now hold that the three-year prescriptive period for actions for compensation for property taken by the state set forth in La. R. S. 13:5111 governs and the plaintiffs' inverse condemnation claims are prescribed.

REVERSED IN PART; AFFIRMED IN PART.

Chief Judge Susan M. Chehardy of the Court of Appeal, Fifth Circuit, heard this case as Justice pro tempore, sitting in the vacant seat for District 1 of the Supreme Court. She is now appearing as an ad hoc for Justice William J. Crain. Retired Judge James H. Boddie, Jr., appointed Justice ad hoc, sitting for Justice Marcus R. Clark. Retired Judge Robert Kostelka, appointed as Justice ad hoc, sitting for Justice Genovese, recused.

SUPREME COURT OF LOUISIANA

No. 2019-C-0160

STEVE CROOKS AND ERA LEE CROOKS

VERSUS

STATE OF LOUISIANA, DEPARTMENT OF NATURAL RESOURCES

On Writ of Certiorari to the Court of Appeal,
Third Circuit, Parish of Rapides

**KIRBY, Justice ad hoc**\* \*\* \*\*\*

We granted certiorari in this class action to determine whether the plaintiffs'

inverse condemnation claims for compensation against the State of Louisiana have

prescribed under La. R.S. 13:5111 and/or 28 U.S.C. § 2501. The lower courts relied

on the decision in *Cooper v. Louisiana Department of Public Works*, 03-1074 (La.

App. 3 Cir. 3/3/04), 870 So. 2d 315[1], to conclude the one-year prescriptive period

for damage to immovable property found in La. C.C. art. 3493 governed and the

continuing tort doctrine applied to prevent the running of prescription on the

plaintiffs' claims. For the reasons that follow, we find the lower courts erred in

relying on *Cooper* and now hold that the three-year prescriptive period for actions

for compensation for property taken by the state set forth in La. R. S. 13:5111

governs and the plaintiffs' inverse condemnation claims are prescribed.

---

[1] After the court of appeal denied rehearing on May 5, 2004, the State filed a writ application seeking review of the lower court's ruling. This Court declined to consider the application because it was untimely. See *Cooper v. Louisiana Department of Public Works*, 2004-1431 (La. 9/24/04), 882 So. 2d 1146; *recons. denied*, 885 So. 2d 1138 (La. 11/08/04).

---

\*Chief Judge Susan M. Chehardy of the Court of Appeal, Fifth Circuit, heard this case as Justice pro tempore, sitting in the vacant seat for District 1 of the Supreme Court. She is now appearing as an ad hoc for Justice William J. Crain.

\*\*Retired Judge Michael Kirby, appointed as Justice ad hoc, sitting for Justice Clark.

\*\*\*Retired Judge Robert Kostelka, appointed as Justice ad hoc, sitting for Justice Genovese, recused.

**FACTS AND PROCEDURAL HISTORY**

In 1962, the United States began constructing various structures[2] in and around the Catahoula Basin pursuant to a congressionally-approved navigation project under the River and Harbor Act of 1960 to promote navigation on the Ouachita and Black Rivers. In conjunction with that project, the State of Louisiana signed an "Act of Assurances," which obligated the State to provide the federal government with all lands and property interests necessary to the project free of charge, and to indemnify the federal government from any damages resulting from the project.

The project was completed in 1973 and, at that time, the United States Fish and Wildlife Service began managing the water levels in and around the Catahoula Basin. As intended, these water management activities increased water levels in the Catahoula Basin and prolonged the natural annual high-water fluctuations. The U.S. Fish and Wildlife Service continues to manage the water levels in the Catahoula Basin to this day. Also, the State, through the Department of Wildlife and Fisheries, has granted mineral leases in the area known as Catahoula Lake.

On May 4, 2006, plaintiffs Steve Crooks and Era Lea Crooks filed a "Class Action Petition to Fix Boundary, For Damages and For Declaration [sic] Judgment." The Crookses alleged that they represent a class of landowners in the Catahoula Basin whose property is affected by the increased water levels from the project. Ultimately, the trial court certified the plaintiffs as one class, but subdivided that class into two groups – the "Lake Plaintiffs" and the "Swamp Plaintiffs" – depending on the location of the properties affected.

---

[2] These structures include the Jonesville Lock and Dam, Archie Weir on Little River, and the Catahoula Diversion Canal.

Specifically, the Lake Plaintiffs are those property owners who sought (1) ownership of the land between the ordinary low and ordinary high water mark of the Little River located within the area known as Catahoula Lake; (2) a declaration that these lands were unlawfully expropriated by the navigation project, which obstructed the natural servitude of drainage; (3) damages for this inverse condemnation; and (4) recovery of the mineral royalty and other payments received by the State from mineral leases granted over the immovable property at issue.

The Swamp Plaintiffs are those persons owning property in the southwestern portion of the Catahoula Basin, designated as "overflow lands." Much of the land bordering and lying outside Catahoula Lake was approved as swampland and transferred to the State by the federal government under the Swampland Acts of 1849 and 1850. It is not disputed that these lands are below an elevation of 36 feet mean sea level, and that their titles originated from patents issued by the State. Because ownership of these swampland tracts is not disputed, these plaintiffs sought only a declaration of unlawful expropriation and damages for the inverse condemnation.

The central issue presented to the trial court in the claim of the Lake Plaintiffs was the classification of the area known as Catahoula Lake. The Lake Plaintiffs contended that, although referred to as a lake, the area actually constitutes the banks of the Little River, thus conferring on the Lake Plaintiffs ownership of those lands between the ordinary low and the ordinary high water mark. See La. C.C. art. 456.[3] The State countered, filing a reconventional demand which sought a declaration

---

[3] La. C.C. art. 456 provides, in pertinent part:

> The banks of navigable rivers or streams are private things that are subject to public use.

> The bank of a navigable river or stream is the land lying between the ordinary low and the ordinary high stage of the water.

3

recognizing that Catahoula Lake is a lake and the State owns the bed and waters below the ordinary high water mark. See La. C.C. art. 450.[4]

In addition, the State filed a peremptory exception of no right of action asserting that the plaintiffs have no right of action against the State for any inverse condemnation by the federal government because the Act of Assurances is not a *stipulation pour autrui*, and/or a right of action only inures to those persons owning the land at the time it was taken, and only one of the plaintiffs had ownership when the navigation project was completed in 1973. The State also filed a peremptory exception of prescription, arguing that the plaintiffs' claims are prescribed under 28 U.S.C. §2501[5] and, alternatively, under La. R.S. 13:5111[6] or La. R.S. 9:5624[7].

Following a bench trial, the trial court rendered a judgment in favor of the plaintiffs, declaring that the body of water in the Catahoula Basin in 1812 was a permanent river that seasonally overflowed and covered its banks; the riparian landowners, *i.e.*, the Lake Plaintiffs, are the owners of these river banks; and the State is liable for the inverse condemnation of these lands because of the significant obstruction of the natural servitude of drainage.

---

[4] La. C.C. art. 450 provides, in pertinent part:

> Public things that belong to the state are such as running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore.

[5] 28 U.S.C. § 2501 provides, in pertinent part, that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."

[6] La. R.S. 13:5111 provides:

> Actions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking.

[7] La. R.S. 9:5624 provides:

> When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run when the damages are sustained.

4

Relevant to the issue before us, the trial court denied the State's exception of prescription, finding the *Cooper* case to be on point and controlling. The trial court found that the two-year prescriptive period of La. R.S. 9:5624 does not apply because the statute addresses a situation in which private property is damaged for public purposes, and the case at hand involves claims for inverse condemnation, *i.e.*, an appropriation (taking) without the institution of formal judicial proceedings. The trial court also found that the three-year prescriptive period for takings found in La. R.S. 13:5111 does not apply, because the United States, not the State, effected the taking.

The trial court then determined the prescriptive period applicable to the case is the one-year prescriptive period for damage to immovable property found in La. C.C. art. 3493[8]. Under Article 3493, prescription runs from the date the owner of immovable property knew or should have known of the damage. The trial court found that plaintiffs knew or should have known of the increased flooding of their lands no later than 1973 when the navigation project was completed. Nonetheless, and again citing *Cooper*, the trial court determined that prescription had not commenced to run on the plaintiffs' claims because "the constant interference with [the plaintiffs'] natural servitudes of drain[age] by the defendant, causing the increased duration of the flooding of their lands, constitutes continuing tortious conduct." The trial court found, through the application of the continuing tort doctrine, that prescription had not commenced to run on the plaintiffs' claims.

---

[8] La. C.C. art. 3493 provides:

> When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage.

5

In deciding the peremptory exception of no right of action, the trial court found that the United States is the party that inversely condemned the plaintiffs' lands. Referring to the language of the "Act of Assurances," the trial court concluded the State undertook the obligation of acquiring "all lands, easements, and rights of way, including flowage rights in overflow areas" necessary for the project, and agreed to "hold and save the United States free from damages" due to the same. The trial court found this language constituted an indemnification agreement. It further reasoned that the agreement was expressly intended to benefit a specific identifiable class of persons: those landowners whose properties would be adversely affected by the project. Consequently, the trial court found that those landowners are third party beneficiaries of the Act, which constitutes a *stipulation pour autri*, which in turn conveys upon the plaintiffs a right of action directly against the State. Again, the trial court relied on *Cooper* to support its conclusion.

The trial court also rejected the State's argument that a right of action for just compensation for a taking inures only to those persons owning a parcel at the time of the taking. The trial court acknowledged that only one plaintiff demonstrated ownership prior to 1973, but found that the subsequent purchaser doctrine established in *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 2010-2267 (La. 10/25/11), 79 So. 3d 246, does not apply to a subsequent purchaser where, "there is obviously continuing, persistent, and ongoing tortious acts creating a continuing tort," as in the present case.

The trial court, citing *Cooper*, found that any interference with the natural servitude of drainage constitutes a taking or damage that entitles a landowner to compensation for inverse condemnation. The court determined that the man-made structures installed in and around the Catahoula Basin altered the natural conditions in the basin and significantly obstructed the natural drainage of the area, flooding

6

lands that would have been dry for longer periods of time. In effecting this change, the trial court found that the United States exceeded its rights as owner of the servient estate, entitling the plaintiffs to damages for the inverse condemnation of their lands. The trial court reasoned "the servient estate owes an absolute duty to the dominant estate to receive waters which naturally flow upon it, and … the man-made structures violated that duty by flooding both riparian and overflow lands with not only more water, but also for longer periods of time," entitling the plaintiffs to damages for the inverse condemnation of their lands.

Based on its findings, the trial court awarded expropriation damages of $28,745,438.40 to the Lake Plaintiffs and $9,550,800.00 to the Swamp Plaintiffs, as owners of the overflow lands. The trial court also awarded the Lake Plaintiffs $4,694,309.68 for oil and gas royalties attributable to mineral production from the riparian lands from May 2003 to trial.[9]

The majority of the court of appeal found no manifest error in the trial court's finding that, in 1812, the area known as Catahoula Lake was a permanent river that seasonally overflowed and covered its banks. The court of appeal agreed with the trial court's analysis of *Cooper* and conclusion that the Act of Assurances is a *stipulation pour autrui*, conferring on the plaintiffs a right of action against the State for inverse condemnation.

As to the issue of liberative prescription, the court of appeal, relying on *Cooper*, found that the United States unlawfully expropriated the plaintiffs' property because it initiated, constructed, and currently manages and maintains the navigation project and controls the water levels. Noting that prescriptive statutes are strictly

---

[9] The trial court also awarded the plaintiffs attorneys fees, expert witness fees and costs, which the court of appeal vacated in *Crooks v. Department of Natural Resources*, 2017-750, p. 35-38 (La. App. 3 Cir. 12/28/18), 263 So. 3d 540, 565-67 (Amy, J., dissents). The award for those items is not at issue in this writ application.

construed and La. R.S. 13:5111 addresses only takings "by the state, a parish, municipality, or other political subdivision or any one of their respective agencies," the court of appeal found La. R.S. 13:5111 inapplicable. The court of appeal found La. C.C. art. 3493 governed the plaintiffs' claims and that tort law appropriately applied to their case. The court of appeal then turned to the question of whether the acts of the United States constitute a continuing tort.

Noting that the court in *Cooper* found that each interference with the servitudes of drainage constituted a separate, continuous tort, the court of appeal agreed with the trial court that prescription has not run on the plaintiffs' claims due to the continuing tort doctrine. The court of appeal also found *Eagle Pipe* inapplicable in the case of a continuing tort because the wrongful conduct and damages have continued during the plaintiffs' ownership.

Judge Amy dissented. With respect to the issue at hand, he found the plaintiffs' claims are barred by La. R.S. 13:5111 and opined the *Cooper* court erred in applying tort law in the context of an appropriation claim. He noted that *Cooper* was a break from longstanding precedent that the taking of property, by flooding or otherwise, without the proper exercise of eminent domain, is not a tort but an appropriation. Judge Amy disagreed with the *Cooper* court's finding that the United States and not the State was responsible for the appropriation, citing *Succession of Rovira v. Bd. of Comm'rs of Port of New Orleans*, 418 So.2d 1382 (La. App. 4 Cir. 1982). Because the State agreed to provide the property free of charge to the United States in *Cooper*, he opined the State took the property, not the United States. Also, because the plaintiffs' suit is one for an unlawful taking, not for damage to the property caused by the construction of the project, Judge Amy concluded the suit is one for a taking by the State within the meaning of La. R.S. 13:5111. Given that the plaintiffs were aware of the increased inundation of their properties in 1973, when the project was

8

completed, he found their claims for compensation for inverse condemnation are long since prescribed.

We granted the State of Louisiana Department of Natural Resources' writ application and ordered briefing and argument limited to the issue of whether "[t]he lower courts erred in failing to find that the [p]laintiffs' inverse condemnation claims have prescribed under either or both La. R.S. 13:511 or 28 U.S.C. § 2501." *Crooks v. Department of Natural Resources*, 2019-0160 (La. 5/6/19), 269 So. 3d 691.

After we granted the writ, but prior to oral argument, pursuant to La. C.C.P. art. 2163, the State filed a peremptory exception of prescription, arguing for the first time that if the Court finds the Act of Assurances constitutes a *stipulation pour autrui*, giving the plaintiffs an inverse condemnation cause of action against the State, then the plaintiffs' action to enforce the stipulation in their favor is subject to prescription of ten years under La. C.C. art. 3499.[10] The State also filed a peremptory exception of no cause of action asserting the plaintiffs have no cause of action against the State for mineral royalties, and asks the Court to vacate the award of $4,694,309.68, which represents the oil and gas royalties attributable to the mineral production from the riparian lands between May 2003 and the date of trial.

## LAW AND DISCUSSION

The Louisiana Constitution provides:

> Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
>
> Property shall not be taken or damaged by the State or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be

---

[10] See La. C.C. art. 3499 ("Unless otherwise provided by legislation, a personal action is subject to a liberative prescription of ten years."); see also *Hazelwood Farm, Inc. v. Liberty Oil & Gas Corp.*, 2002-266 (La. App. 3 Cir. 04/02/03), 844 So. 2d 380, 389-90 (A third party beneficiary of a *stipulation pour autrui* claiming damages arising out of the breach of a contractual obligation states a cause of action in contract. Breach of contract claims are subject to a liberative prescription period of ten years as provided by La. C.C. art. 3499.)

taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. …

La. Const. art. I, § 4 (1974). The Constitution requires compensation even though the State has not initiated expropriation proceedings in accordance with the statutory scheme established for that purpose. *State, Through Dept. of Transp. and Dev. v. Chambers Investment Company, Inc.*, 595 So. 2d 598, 602 (La. 1992). The "inverse condemnation" action "provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced." *Id.* Inverse condemnation claims derive from the Takings Clauses contained in both the Fifth Amendment of the U.S. Constitution and Art. I, § 4 of the Louisiana Constitution. "The action for inverse condemnation is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal." *Id*. (Citations omitted.) The constitutional command of Art. I, § 4 is self-executing, such that the cause of action arises whenever a state commits a taking without justly compensating the victim. *Id*.

Having reviewed the evidence in the record, we find no manifest error with regard to the following factual findings by the trial court: the body of water in the Catahoula Basin in 1812 was a permanent river that seasonally overflowed and covered its banks; the riparian landowners, *i.e.*, the Lake Plaintiffs, own of the land between the ordinary low and ordinary high water mark of the river's bank; and the man-made structures installed in and around the Catahoula Basin caused significant flooding of both the riparian and overflow lands, which obstructed the natural servitude of drainage of the area.

We turn now to consider whether or not the plaintiffs' inverse condemnation claims have prescribed. The plaintiffs seek compensation for the increased water on their property as a result of the navigation project. It is well settled that "[t]he taking of property, by flooding or otherwise, without proper exercise of eminent domain, is not a tort but is considered an appropriation." *Hawthorne v. La. Dep't of Pub. Works*, 540 So.2d 1261, 1262 (La. App. 3 Cir.), *writ denied*, 544 So. 2d 406 (La. 1989). "Appropriation involves the taking of a servitude, whereas expropriation may involve the taking of ownership." Yiannopoulus, *Civil Law Treatise (Property)*, V. 2, § 5:8, P. 216 n.20 (5th ed. 2015). See also *South Lafourche District v. Jarreau*, 2016-0788, 2016-0904, p. 10 (La. 3/31/17), 217 So. 3d 298, 305[11]. The prescription of nonuse does not run against natural servitudes. La. C.C. arts. 758 and 3448. However, the natural servitude of drainage, see La. C.C. art. 655[12], may be altered by agreement if the public interest is not affected adversely. La. C.C. art. 729; *Carbo v. City of Slidell*, 01-0170, p. 14-15 (La. App. 1 Cir. 1/8/03), 844 So. 2d 1, 12. The natural servitude of drainage can be altered by lawful acts of persons. *Carbo*, 01-0170 at 15, 844 So. 2d at 13. The natural servitude of drainage can be altered by "the reasonable exercise of police power." *Id*., citing La. Const. art. I, § 4 (1974).

Section 5111 of Title 13 is entitled "Appropriation of property by the state, parish, municipality or agencies thereof; attorney, engineering and appraisal fees; prescription" and provides, in pertinent part: "Actions for compensation for property

---

[11] *Cert. denied*, *Jarreau v. South Lafourche Levee District*, 138 S.Ct. 381, 199 L. Ed. 279 (2017).
[12] La. C.C. art. 655, provides:

> Natural drainage
>
> An estate situated below is bound to receive the surface waters that flow naturally from an estate situated above unless an act of man has created flow.

taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking."

In this case, the lower courts determined the plaintiffs' inverse condemnation claims for compensation are not barred by liberative prescription, including La. R.S. 13:5111, relying on the decision in *Cooper v. Louisiana Department of Public Works*, 03-1074 (La. App. 3 Cir. 3/3/04), 870 So. 2d 315. In that case, landowners filed suit against the Louisiana Department of Public Works seeking compensation for the permanent flooding of portions of their land resulting from the same project at issue in this case. The court of appeal majority characterized the landowners' claims as being based upon "the permanent flooding of portions of their lands which the impingement of their servitude of drainage caused" and determined that "any interference with a servitude is a violation of [La. C.C. art.] 667 which gives rise to a delictual action that prescribes in one year." *Id.*, p. 4, 870 So. 2d at 321-22. Though the parties stipulated that the landowners were aware of the inundation beginning in 1972 and suit was not filed until 1994, the majority concluded that the landowners' claims had not prescribed according to the continuing tort doctrine, stating:

> [I]f the operating cause of injury is tortious and continually gives rise to successive damages, prescription begins to run from the cessation of the particular wrongful conduct causing the damage. "A continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act."
>
> In this matter, because each instance of damage (each interference with the servitudes of drainage) constitutes a tort under Article 667 and given Plaintiffs' belief that, both, the damage and interference are continuous, Plaintiffs assert that each of these torts qualifies as a continuing tort. We agree.
>
> ....
>
> [P]rescription will not run in this case until the flooding of Plaintiffs' lands is abated. Therefore, we find, through application of the continuing tort theory, that prescription has not, yet, begun to run on their claims for compensation.

*Id.,* pp. 5-6, 870 So. 2d at 322-23 (footnotes omitted). The court further reasoned that La. R.S. 13:5111 was inapplicable because the United States, not the State of Louisiana, had appropriated the landowners' property.

The facts in *Cooper* are, in all material respects, identical to the facts in the present case. Nonetheless, we agree with dissenting Judge Amy that the majority in *Cooper* erred by applying tort doctrine to an appropriation claim. In doing so, the *Cooper* majority ignored the court's own longstanding precedent that "[t]he taking of property, by flooding or otherwise, without proper exercise of eminent domain, *is not a tort* but is considered an appropriation." *Hawthorne*, 540 So.2d at 1262 (emphasis added) (citing *Bernard v. State, Dep't of Pub. Works*, 127 So.2d 774 (La. App. 3 Cir. 1961); *Boothe v. Dep't of Pub. Works*, 370 So.2d 1282 (La. App. 3 Cir.), *writ denied*, 374 So.2d 661 (La.1979)). Judge Amy pointed out that in both *Hawthorne*, 540 So.2d 1261, and in *Cooper v. La. Dep't of Pub. Works*, 540 So.2d 1265 (La. App. 3 Cir. 1989)[13], the claims for compensation, which the court concluded had prescribed under La. R.S. 13:5111, were based on the same project at issue in *Cooper* and in the present case. See *Crooks*, 2017-750, 263 So. 3d at 569 (Amy, J., dissenting).

Furthermore, we agree with Judge Amy that the majority in *Cooper* erred in determining the United States, and not the State, appropriated the plaintiffs' property. In *Succession of Rovira v. Board of Commissioners of Port of New Orleans*, 418 So.2d 1382 (La. App. 4 Cir.), *writ denied*, 423 So.2d 1147 (La. 1982), the State agreed to furnish, free of cost to the United States, all lands, easements, rights-of-way, and spoil disposal areas for the construction of the Mississippi River Gulf Outlet (MRGO) and delegated this task to a local entity, the Dock Board. A

---

[13] In the dissent, Judge Amy refers to *Cooper v. La. Dep't of Pub. Works*, 540 So.2d 1265(La. App. 3 Cir. 1989) as "*Cooper I*" and *Cooper v. Louisiana Department of Public Works*, 03-1074 (La. App. 3 Cir. 3/3/04), 870 So. 2d 315 as "*Cooper II*".

portion of the plaintiffs' private property was occupied and used for the channel of the MRGO, but there had been neither expropriation proceedings nor compensation paid to the plaintiffs. *Id.* The plaintiffs sued the Dock Board, and, in concluding that the United States was not an indispensable party, the fourth circuit found that, based on the documents ordering and authorizing the Dock Board to acquire the rights-of-way, the Dock Board was the public body that was the "taker" of the land used in construction. *Id*. The court noted that the plaintiffs' claims were for compensation for their lands taken and the dispute was between the plaintiffs and the Dock Board as "taker". The court found it mattered not that the United States, as recipient of the lands taken, constructed the waterway and continued to operate it, because the Dock Board, not the United States, was the entity which had to respond to the claims asserted by the plaintiffs. The court also emphasized that the plaintiffs' claims were not for property damage occasioned by construction, but for compensation for the "taking" of the property. *Id.* at 1386-87. Similarly, in this matter, the State contractually assumed the role of taking the property, facilitated the taking, assumed liability for the taking, and thus legally assumed the role of taker.

As mentioned above, the plaintiffs here seek compensation for the taking of their property. Given that the dispute is between the plaintiffs and the State as the "taker" of the land used for the project, we conclude that the plaintiffs' claims for compensation are governed by the prescriptive period in La. R.S. 13:5111, and the lower courts erred in holding otherwise. The lower courts' application of the continuing tort doctrine to this case, as opposed to La. R.S. 13:5111, contravenes the general rule under Louisiana law "that when conflicting statutes are applicable, the one more specifically directed to the matter applies." *Avenal v. State*, 03-3521, p. 33 (La. 10/19/04), 886 So.2d 1085, 1108 n.29 (citing *Estate of Patout v. City of New*

14

*Iberia*, 98-0961 (La. 7/7/99), 738 So.2d 544), *cert. denied*, 544 U.S. 1049, 125 S.Ct. 2305, 161 L.Ed.2d 1090 (5/23/05).

Pursuant to La. R.S. 13:5111, prescription begins to run when the claimant is aware of those facts which give rise to a cause of action. *Hawthorne*, 540 So.2d 1261. The record here indicates the plaintiffs or their ancestors in title were aware or should have been aware of the increased inundation of their lands no later than 1973 when the water level failed to seasonally subside as it had done in the past. Louisiana R.S. 13:5111 was passed in 1975. See 1975 La. Acts No. 434, § 1. Because the plaintiffs filed their class action petition in May 2006, which was more than thirty years after the passage of La. R.S. 13:5111, we find their claims for compensation were already prescribed when they filed their class action petition. See *Hawthorne*, 540 So.2d 1261 (holding that the landowner's claim for compensation for a taking that occurred in 1972 was prescribed under La. R.S. 13:5111 because the landowner did not file suit until 1981).

Having found that the plaintiffs' inverse condemnation claims against the State for compensation have prescribed, we express no opinion as to the applicability of 28 U.S.C. § 2501 to this matter. Furthermore, the State's peremptory exception of prescription raised in this Court regarding the applicability of La. C.C. art. 3499 is moot.

Next, we address the State's peremptory exception of no cause of action objecting to the plaintiffs' claim for the mineral royalties. The peremptory exception of no cause of action is premised on the following syllogism: 1) the Lake Plaintiffs' claim to the royalties is an action for unjust enrichment; 2) the action for unjust enrichment is only available where the law provides no other remedy, see La. C.C. art. 2298; see also *Hall v. James*, 43, 263 (La. App. 2 Cir. 6/4/08), 986 So. 2d 817; and, 3) the law provides the plaintiffs an exclusive remedy against the unit operator

pursuant to La. R.S. 30:10(A)(3)[14] and *Taylor v. Woodpecker Corp.*, 562 So. 2d 888 (La. 1990).

As used in the context of a peremptory exception, a "cause of action" refers to the operative facts which give rise to the plaintiff's right to judicially assert an action against the defendant. *MAW Enterprises, L.L.C. v. City of Marksville*, 2014-0090, p. 6 (La. 9/3/14); 149 So. 3d 210, 215, *citing Scheffler v. Adams and Reese, LLP*, 2006-1774, p. 4 (La. 2/22/07), 950 So. 2d 641, 646; *Everything on Wheels Subaru, Inc. v. Subaru South, Inc.*, 616 So. 2d 1234, 1238 (La. 1993). The peremptory exception of no cause of action is designed to test the legal sufficiency of the petition by determining whether the plaintiff is afforded a remedy in law based on the facts alleged in the pleading. *Fink v. Bryant*, 01-0987, pp. 4-6 (La. 11/28/01), 801 So. 2d 346, 349-50; *Louisiana Paddlewheels v. Louisiana Riverboat Gaming Commission*, 94–2015 (La. 11/30/94), 646 So.2d 885. The exception is triable on the face of the pleadings and for the purposes of determining the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. *Vince v. Metro Rediscount Company, Inc.*, 2018-2056 (La. 2/25/19), 264 So. 3d 440; *City of New Orleans v. Board of Commissioners,* 93–0690 (La.7/5/94), 640 So.2d 237. All reasonable inferences are made in favor of the nonmoving party in determining whether the law affords any remedy to the plaintiff. La. C.C. P. arts. 927, 931; *Mayer v. Valentine Sugars, Inc.,* 444 So.2d 618 (La. 1984). The burden of showing that the plaintiff has stated no cause of action is upon the exceptor. *City of New Orleans v.*

---

[14] La. R.S. 30:10(A)(3) provides:

> If there is included in any unit created by the commissioner of conservation one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale.

*Bd. of Directors of Louisiana State Museum*, 98-1170, pp. 9-10 (La. 3/2/99), 739 So. 2d 748, 755-56.

Generally, under La. C. C. P. art. 931, no evidence may be introduced to support or controvert the exception of no cause of action. *MAW Enterprises, L.L.C.*, 2014-0090 at 7, 149 So. 3d at 215. However, an exception to this rule has been recognized by the jurisprudence, and a court may consider evidence admitted without objection to enlarge the pleadings. *Id.,* citing *City of New Orleans*, 98-1170 at 10, 739 So. 2d at 756. Thus, where, as here, the exception has been raised for the first time after trial on the merits, a determination by this court of whether the plaintiff may maintain a cause of action against the defendant may be made by a review of all the facts supported by the record. See *id*. A court appropriately sustains the peremptory exception of no cause of action only when, conceding the correctness of the facts, the plaintiff has not stated a claim for which he or she can receive legal remedy under the applicable substantive law. *Id; Industrial Companies, Inc. v. Durbin*, 2002-0665, p. 7 (La. 1/28/03), 837 So. 2d 1207, 1213.

Applying the aforementioned legal precepts, we find no merit to the State's argument that the plaintiffs' claim for reimbursement of the mineral royalties is merely one of unjust enrichment whose remedy is against the unit operators only, and its reliance on *Taylor*, supra, is misplaced. In *Taylor*, owners of unleased mineral interests sued the purchaser of production from their unit to recover their share of the proceeds of the sale. This Court framed the issue before it as follows: "whether a party claiming rights as an unleased mineral interest owner in a pooled drilling unit …has a right and/or cause of action against a purchaser of unit production to recover the value of his share." *Taylor*, 562 So. 2d at 889. In resolving the issue, the Court held:

17

> As owners of an unleased interest who have not made arrangements to separately dispose of their share of production, the [plaintiffs'] right to take possession of their share of production is limited by the unit operator's right to sell their share. Upon sale by the unit operator, an unleased interest owner's right to recovery is limited to recovery of a pro rata share of the proceeds of the sale from the operator. The [plaintiffs] have no action to recover their share of production or the value of their share of production from Ashland, the purchaser, on the basis of articles 2301 and 2312 because of the provisions of LSA-R.S. 30:10(A)(3).

*Id.*, 562 So. 2d at 892.

*Taylor* is distinguishable from the case at hand, as the defendant in *Taylor* was the purchaser of production, not the royalty recipient. That being the case, the Court in *Taylor* concluded that the purchaser could not be made to pay twice; rather the recipient of the proceeds (the operator) was responsible for the reimbursement.

In this case, a review of the petition, and of the evidence adduced without objection, reveals that the operative facts which give rise to this litigation are that the State granted mineral leases on plaintiffs' lands, and received mineral royalties from those leases. Accepting these facts as true, the plaintiffs have asserted a cause of action against the State for mineral royalties pursuant to La. C.C. art. 488, which provides:

> Products derived from a thing as a result of diminution of its substance belong to the owner of that thing. When they are reclaimed by the owner, a possessor in good faith has the right to reimbursement of his expenses. A possessor in bad faith does not have this right.

In *Lamson Petroleum Company v. Hallwood Petroleum, Inc.*, 99-1444 (La. App. 3 Cir. 5/24/00), 770 So. 2d 786, the court of appeal was presented with competing claims to ownership of mineral leases covering a disputed piece of property. The plaintiff, Lamson, held a mineral lease over a particular parcel of land. Hallwood Petroleum also held a lease of the same property, obtained from different property owners. The dispute boiled down to which lessors were the proper owners of the tract. The issue of ownership was decided in favor of Lamson, which then

sought the proceeds of production from the Hallwood lease. In addressing the issue of Lamson's entitlement to the proceeds of production from the lease, the court of appeal noted that Lamson had been appointed agent for its lessors in pursuing the return of royalties improperly paid, and as a result had a cause of action under La. C.C. art. 488. Hallwood countered that Lamson (representing the landowners) was limited by the provisions of La. R.S. 30:10(A)(3) to a claim against the operator of the well (basically the same argument the State asserts herein). The court of appeal rejected this assertion, holding:

> While La. R.S. 30:10 does provide a remedy for unleased property owners to recover their share of the proceeds of a well from the operator of that well, we find no authority for the proposition that it provides the exclusive remedy for unleased land owners. In *Bonnett v. Mize*, 556 So.2d 228 (La. App. 2 Cir. 1990), *writ denied*, 559 So.2d 1360 (La. 1990), the court considered a case where a good faith possessor of immovable property received money from a mineral lease of that property. The court found that because the conveyance of the property to the good faith possessors was invalid, the owner was entitled to a money judgment against the good faith possessor for mineral lease rental payments and royalties received. While we agree that the Appellants have not been alleged to be the operator of the well, we find no error in the trial judge's decision to grant judgment against the Appellants as good faith possessors of the property at issue and in favor of Lamson, standing in the shoes of the owners.

*Lamson*, 99-1444 at 17-18, 770 So.2d at 798. We find the holdings in *Lamson* and *Bonnett* reinforce our conclusion that the plaintiffs have a cause of action for mineral royalties under La. C.C. art. 488, and their cause of action is not merely one in unjust enrichment with an exclusive remedy under La. R.S. 30:10.[15]

Therefore, the peremptory exception of no cause of action filed by the State is overruled.

---

[15]Since we have concluded that the plaintiffs are not restricted to relief under La. R.S. 30:10, it is unnecessary to address the State's claim in footnote 9 to its supplemental brief that the plaintiffs' unjust enrichment claim is barred by sovereign immunity.

**DECREE**

For the reasons expressed herein, the court of appeal judgment is reversed, in part, insofar as it upheld the award of $28,745,438.40, and the interest thereon, to the Lake Plaintiffs, and the award of $9,550,800.00, and the interest thereon, to the Swamp Plaintiffs, the owners of the overflow lands, for compensation for the inverse condemnation of their lands by the State. In all other respects, the judgment is affirmed.

**REVERSED IN PART; AFFIRMED IN PART.**